779 So.2d 485 (2000)
Robert G. SCHAEFFER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-2034.
District Court of Appeal of Florida, Second District.
November 17, 2000.
Rehearing Denied January 19, 2001.
John F. McGuire and Dale E. Workman, Clearwater, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Timothy A. Freeland, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
Affirmed.
PARKER, A.C.J., and WHATLEY, J., Concur.
SEALS, JAMES H., Associate Judge, Concurs specially.
SEALS, JAMES H., Associate Judge, Concurring.
This case is a prime example of what can go wrong when sentences are decided outside the courtroom by someone other than the presiding judge.
The Prison Releasee Reoffender Punishment Act, chapter 97-239, Laws of Florida, as codified in section 775.082(8), Florida Statutes (1997) (hereafter called the PRRPA), seeks to punish a certain class of offenders by mandating the maximum sentence normally prescribed for the crime and then requiring the offender to serve every day of that sentence.[1] It is the legislature's expressed intent that these designated offenders "be punished to the fullest extent of the law." § 775.082(8)(d), Fla. Stat. (1997).[2] An offender must meet two conditions to receive the mandated punishment under the PRRPA: (1) the offender must be convicted of one of the enumerated felonies; and (2) the offender must either be serving a prison sentence, or on escape status from a Department of Corrections facility, or have been released from such a facility within the preceding three years.
The legislature provided only one check on this otherwise mandatory sentence. When "extenuating circumstances" exist, the statute permits the offender to be sentenced *486 in the conventional manner. Id. at (8)(d)(2). Only one extenuating circumstance, the victim's recommendation that the offender not be sentenced under the PRRPA, is mentioned in the statute. What makes the Prison Releasee Reoffender Punishment Act unusual is the legislature did not delegate the power to make exceptions based upon extenuating circumstances to the sentencing judge. The power was delegated to the prosecution. I have no quarrel with the legislature's creation of the power to sentence certain offenders to the fullest extent of the law, as described in the PRRPA. It is to whom that power was granted, and that alone, which forces me to take exception.
Robert Schaeffer was convicted by a jury of armed robbery, a first degree felony, on January 28, 1999. The prosecutor invoked the PRRPA and had Mr. Schaeffer sentenced to thirty years' imprisonment. The trial judge correctly rejected all pleas not to sentence Mr. Schaeffer under the PRRPA because the law did not give him that choice. At the prosecution's insistence he pronounced the prescribed sentence and signed the judgment that officially committed Mr. Schaeffer to the Department of Corrections for the next 10,958 days of his life. While I must affirm the conviction and sentence in this case, I can only concur with the lower court's rulings because our supreme court's holding in State v. Cotton, 769 So.2d 345 (Fla.2000), requires that I do so. However, I am compelled to address the senseless result achieved in this case of executive branch sentencing.
Mr. Schaeffer committed the instant offense at the age of twenty-five in the twenty-fifth month following his release from a Florida prison on December 29, 1995. Thus, Mr. Schaeffer was eligible for punishment pursuant to the PRRPA, because he committed one of the offenses enumerated in section 775.082(8)(a)(1), and he did so "within 3 years of being released from a state correctional facility operated by the Department of Corrections."
The events leading to this young man's incarceration for thirty years began at a Burdines Department Store at Countryside Mall in Clearwater on February 1, 1998. A store security officer, Ms. Frances Mumford, observed Mr. Schaeffer and two companions, one male and one female, enter the west Burdines entrance. Ms. Mumford immediately noticed that the young woman carried a very large purse. Her suspicion was aroused so she watched the trio as they moved about the store. In the young men and boys' department, they took merchandise off of hangers and hid it inside the purse. They exited the store the same way they had entered.
As she was trained to do, Ms. Mumford gave the suspects an opportunity to pay for the merchandise or put it back on the shelves before she pursued them. When they were in the parking lot, she called her supervisor for assistance and approached the three shoplifters. She took hold of the jacket of Mr. Schaeffer's male companion, who slid out of it and fled the area, so she turned her attention to the young woman. As she did so, Mr. Schaeffer took out a can of pepper spray and "maced" her from a very close distance-perhaps only three feet. She struggled to protect her face with her hair, but he persisted in spraying her. Leaving Ms. Mumford with "the worst feeling," unable to focus and sick to her stomach, Mr. Schaeffer eventually grabbed the purse from his female accomplice and ran off. Mr. Schaeffer was apprehended nearby and was immediately identified by Ms. Mumford and other witnesses to the incident.
Mr. Schaeffer's conduct technically met the elements of an armed robbery. There was a theft, which at the point of taking occurred without any use of force, violence, assault, or putting in fear. It was a shoplifting, which by its very nature is intended to be discharged with undetected stealth. *487 Later, in the parking lot, force and violence was used. Because the best practice in shoplifting apprehension is to wait until the offenders are outside the storeto assure that the criminal intent comes to full fruitionthe eventual confrontation giving rise to the use of force is still considered to be "in the course of the taking." Lastly, when Mr. Schaeffer used the pepper spray in his attempt to resist Ms. Mumford's efforts, he used a "weapon," as defined by section 790.001(13), Florida Statutes (1997). A chemical weapon meets the weapon element for an armed robbery, and pepper spray is considered a chemical weapon unless it is classified as a "self-defense spray." § 790.001(3)(b), Fla. Stat. (1997).[3]
What occurred here was nothing like the familiar, and far more dangerous, "stick up," where the perpetrator's deliberate intent from the start is to confront his victims with a deadly weapon for the sole purpose of freezing them in fear and rendering them incapable of interfering with the successful execution of the ensuing theft and getaway. On the contrary, this began as a pure property crime relying upon stealth and avoidance of contact with any person. When the store security officer sought to prevent the three perpetrators from getting away with some of the store's merchandise, it was in the course of her apprehension attempt and Mr. Schaeffer's resistance[4] that the split-second decision was made to use pepper spray on Ms. Mumford, resulting in her suffering some intense but temporary discomfort. The course of conduct just described is more akin to a series of discrete misdemeanor crimes, i.e., shoplifting followed by resisting a merchant or assault or battery,[5] than the one crime of robbery. The prosecutor, however, made the choice to charge Mr. Schaeffer with the far more serious crime, the elements of which were technically and fortuitously met, rather than to bring charges that more accurately reflected the events that actually occurred.
The prosecutor's charging decision was lawful. Because reasonable people may disagree about the suitability of the charging decision, let that issue be debated elsewhere. It is the next decision the prosecutor made which in all truth profoundly shocked my judicial conscience.
From our record, it appears that Mr. Schaeffer's criminal history began in 1993, when, not quite twenty-one years old, he was convicted, in four separate cases, of two burglary charges, one offense of possession of burglary tools, and two cocaine possession charges. On June 18, 1993, he was sentenced to concurrent terms of four years in Florida State Prison for all of these offenses. The record also reflects that on September 27, 1994, at the age twenty-two, Mr. Schaeffer was convicted and sentenced for grand theft, possession of cocaine, and possession of paraphernalia, for which he was given time served. Records from the Department of Corrections show that Mr. Schaeffer was released from prison for his 1993 convictions on December 29, 1995, at the age of twenty-three.
Because the criteria for the PRRPA were met, the sentence could follow one of two paths: a judicial sentencing under the *488 sentencing guidelines or an executive sentencing. The choice was in the hands of the prosecution. If the court were permitted to impose a judicial sentence, the sentencing guidelines scoresheet recommended a sentence in the range from 50.25 months to 88.75 months. Mr. Schaeffer would have also been eligible for parole, control release, or other forms of early release. If the prosecution were to elect the executive sentence, then the legislature mandated a 360-month sentence with no possibility of early release.
At sentencing the defense attorney attempted to persuade the trial judge to find that "[o]ther extenuating circumstances exist[ed] which preclude[d] the just prosecution" of Mr. Schaeffer as a prison releasee reoffender. § 775.082(8)(d)(1)(d), Fla. Stat. (1997). Mr. Schaeffer's employer, his father, his wife, and a family friend testified without exception that in the year between the commission of this crime and his sentencing Mr. Schaeffer had done everything in his power to "turn his life around." He held a steady job, he purchased a home, he married his fiancee, and he became a father. His attorney argued that his prior offenses were drug-related and that Mr. Schaeffer had been an addict from a young age, but now he was doing all he could to reform his criminal behaviors. Recognizing that the facts were "technically" sufficient to convict Mr. Schaeffer for armed robbery, his attorney pointed out that the sentence he was receiving was as severe as if he had taken a gun and pointed it at the victim, yet by its nature a can of pepper spray was not designed to do great physical harm to anyone.
The prosecution countered that the judge did not have the discretion the defense was urging him to exercise and averred that the victim, Ms. Mumford, had requested that the prosecution seek the maximum sentencing range for the offense. The record, however, does not tell us what "maximum sentence" she had in mind when she made this out-of-court declaration to the prosecution. Was it the maximum sentence for shoplifting and resisting a merchant? Was it the maximum sentencing guidelines sentence for armed robbery? Or was it the PRRPA sentence? Did she know that the PRRPA sentence was over four times greater than the high end of the sentencing guidelines range? Did she know that he had only been to prison once for nonviolent crimes that apparently resulted from a drug problem? Did she know what was now happening in Mr. Schaeffer's life as described at the time of sentencing by the witnesses? Did she know that the PRRPA sentence would prevent him from raising a new son? Did she know how much it would cost the State of Florida to incarcerate him for 10,958 days?[6] Did she really believe that the retribution of a thirty-year sentence was worth the potential cost this sentence would exact upon Mr. Schaeffer's wife and baby?
Although there were plenty of extenuating circumstances in this case to outweigh even a fully informed victim recommendation for a sentence to the fullest extent of the law, the prosecution was free to ignore each and every one of themand did. Under the PRRPA the prosecutor is not required to make any kind of showing that there are or are not extenuating circumstances. The prosecution does not have to give reasons for its decision. The prosecution is not required to solicit a victim's recommendation, and if it does, it does not have to follow that recommendation. The PRRPA does not require the prosecution to consider anything in the exercise of its discretion because the prosecution's decision cannot be challenged, appealed or set aside. In a time when the legislature is more and more frequently requiring trial judges to make written findings to support *489 their discretionary decisions,[7] all of which are reviewable for abuse, it has contemporaneously given the prosecutor, a party with an interest in the case, the absolute, unchecked power[8] to make choices that could have a drastic effect on a person's liberty. This anomaly is quite a departure from our state's journey to a more just and fair jurisprudence.
Mr. Schaeffer's crime was indeed trauma-inducing and totally unjustifiable, to say nothing of its sheer foolishness. Reasonable prosecutors would differ over how to charge him and reasonable trial judges would differ over how to sentence him. Even without the PRRPA, the potential disparities in charging and sentencing are huge. In one county Mr. Schaeffer could have received a short county jail sentence for shoplifting and resisting a merchant followed by probation with a requirement to repair the harm done to Ms. Mumford and Burdines. In another he could have been charged with robbery and sentenced to prison for a term up to the seven years and four months guideline maximum, followed by probation. Although the judge could exceed the guideline maximum, what judge who had been present throughout all the proceedings and heard all the facts in this record would have found adequate reasons to require the continued expenditure of tax dollars to keep this foolish but repentant new father behind prison walls beyond 88.75 months? Yet a prosecutor was given authority to quadruple that sentence. That alone is unreasonable. The fact that the authority was exercised is incredible.
The legislature was not present at Mr. Schaeffer's trial or sentencing. We do not know if the person in the prosecutor's office who elected to have him sentenced under the PRRPA was present at trial or sentencing.[9] We do know that the judge who heard all evidence at both trial and sentencing was there. Yet his experience, his specialized training, his knowledge, and his independent judgment, which he and countless other judges use when fashioning a punishment to fairly and justly fit each individual defendant's crime and surrounding circumstances, were all preempted. Instead the sentencing decision was made, if not entirely at least in part, somewhere other than in the courtroom. The result, in my opinion, is draconian. It does not sound like the sentence of an American court.
In 1798 the Congress of a young nation with vast unprotected borders and a fledgling national defense passed the Alien and Sedition Acts.[10] Fearing disruption of this great new democratic republic from both the outside and within, Congress gave the President the extraordinary power to deport, detain, or require sureties of certain citizens of any foreign nation deemed hostile to the United States. It was the responsibility of the courts and its marshals to carry out whatever proclamation the President set forth.
These laws raised cries of protest from the states. They prompted the Virginia General Assembly to pass the Virginia Resolutions of 1798 only five months after Congress passed the Alien and Sedition *490 Acts.[11] Among their complaints the Resolutions pointed out that under the Alien Act Congress united legislative and judicial powers and delegated them to the executive, which, according to the Resolutions, "subverts the general principles of free government."[12] Congress soon thereafter repealed the Alien Act.[13]
Two hundred and two years later our legislature, under the PRRPA, has united legislative and judicial powers and delegated them to the executivethe state attorney. What is the legislature so concerned about today that it takes traditional judicial authority away from judges and gives it to prosecutors?
Neither this court nor the trial court has the power to check the excessive penalty the judge was forced to hand out to Robert Schaeffer. The courts can only protest this subversion of the general principles of free government, just as the Virginia General Assembly did in 1798, and entreat the legislature to repose this awesome power where it belongs: with the sentencing judge, subject to his or her reasonable, reviewable exercise of discretion.
NOTES
[1] The Prison Releasee Reoffender Punishment Act was amended and renumbered by chapter 98-203, Laws of Florida, and now appears at section 775.082(9), Florida Statutes (1999).
[2] Under section 775.082(8)(b), Florida Statutes (1997), the offender is not eligible for "parole, control release, or any form of early release."
[3] Section 790.001(3)(b), Florida Statutes (1997), defines "self-defense spray" as a "device carried solely for purposes of lawful self-defense that is compact in size, designed to be carried on or about the person, and contains not more than two ounces of chemical." On this occasion the pepper spray was obviously not used for a self-defense purpose.
[4] Section 812.015(6), Florida Statutes (1997), makes it a first degree misdemeanor for a shoplifter to resist the reasonable efforts of a store security officer in recovering the stolen property.
[5] This would probably not qualify as an aggravated assault or aggravated battery because the weapon used was not a deadly weapon. Moreover, there was no proof of felonious intent for an aggravated assault (his intent was to resist the merchant's efforts to detain his companion), and there was no proof of great bodily harm for aggravated battery.
[6] With a very conservative estimated per diem of $35.00, the total cost would be $328,740.00.
[7] For example, in dissolution of marriage actions, judges are required to make written findings to support their rulings on equitable distribution, alimony, and child custody. See §§ 61.075(3), .08(1), .13(3), Fla. Stat. (2000).
[8] The only check on the state attorney's abuse of discretion in these circumstances is the ballot box, which in the case of an unknown defendant in an unknown case is really no check at all.
[9] Decisions such as this are often made by supervising attorneys, not the assigned trial attorney. Note that section 775.082(a)(2), Florida Statutes (1997), states that "the state attorney may seek to have the court sentence the defendant as a prison releasee reoffender." Whether that means the elected state attorney or one of his or her deputies is not clearly stated in the statute.
[10] See Alien Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570; Sedition Act of July 14, 1798, ch. 74, § 1, 1 Stat. 596.
[11] Kentucky passed similar resolutions that same year. See Kentucky Resolutions, Nov. 10, 1798, reprinted in 2 David M. O'Brien, Constitutional Law and Politics 45-48 (2d ed.1995).
[12] See Virginia Resolutions, Dec. 21, 1798, reprinted in id. at 44-45.
[13] At that time it had not been settled that the federal courts had the power to review the acts of Congress and decide which ones were contrary to the Constitution.